EL PUEBLO DE PUERTO RICO, acusador y apelado, *v.* CATALINO REYES MORALES, acusado y apelante.

*Número:* 16,178      *Resuelto:* 13 de junio de 1966

*Guillermo S. Pierluisi* y *Walter Pierluisi,* abogados del apelante; *J. B. Fernández Badillo, Procurador General,* y *Rodolfo Cruz Contreras, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del Tribunal.

El día 28 de noviembre de 1955 se radicó en la Sala de Arecibo del Tribunal Superior de Puerto Rico, una acusación por asesinato en primer grado contra Catalino Reyes Morales por haber envenenado a un hijo suyo de dos años de edad. El día 24 de febrero de 1956, el jurado trajo un veredicto de culpabilidad por un asesinato en primer grado y el día 29 de febrero de 1956, el Juez que presidió el proceso Hon. Rafael Padró Parés, condenó al acusado apelante a reclusión perpetua. Hasta este momento el acusado apelante estuvo asistido por el Lic. Diego E. Ramos. El día 2 de marzo de 1956, cuando ya no tenía representación profesional alguna, el acusado apelante presentó un escrito de apelación ante este Tribunal.

Desde esa fecha hasta el presente, se ha desarrollado el más dramático esfuerzo por conseguir que el derecho de apelar de Catalino Reyes Morales llegue a una razonable efectividad. La primera moción del acusado apelante de fecha 4 de junio de 1956 solicitando una prórroga de 30 días para que el taquígrafo de la Sala de Arecibo preparara la transcripción de la evidencia a los fines de la apelación interpuesta, fue denegada por el Juez sentenciador, por el fundamento de no haberse radicado en tiempo escrito alguno solicitando dicha transcripción. El 20 de septiembre de 1956 este Tribunal decretó la desestimación del recurso por abandono.

El día 31 de octubre de 1958, el acusado apelante, representado en su nueva gestión por el Lic. Guillermo S. Pierluisi solicitó de este Tribunal se reinstalara el recurso de apelación desestimado, alegando entonces el apelante que "dada la naturaleza tan grave del delito de que se le acusó y condenó y de su situación de insolvencia y pobreza, para

proteger su derecho de apelación, no contando con abogado que le atendiera los trámites incidentales para perfeccionar la misma era obligación del Tribunal en el ejercicio de sus poderes de supervisión, velar porque se preparara la transcripción de la evidencia, sobre todo, habida cuenta la circunstancia especialísima de estar preso el apelante, impedido de hacer las gestiones necesarias en defensa de sus derechos . . . que su petición es meritoria ya que él no es culpable del delito que se le imputa, de haber envenenado a su propio hijo de dos años de edad . . . que surge asimismo de la declaración del Doctor Roberto Vega, quien declarara en el caso, que al practicársele la autopsia a dicho menor, existían muchas lombrices vivas en el vientre y los pulmones, lo que no se explica habida cuenta de lo alegado en contra del aquí apelante, en el sentido de haber envenenado su propio hijo con un insecticida y fungicida que necesariamente tenía que matar dichas lombrices . . . que en relación con los derechos del apelante, se le privó del debido proceso de ley, así como también de la igual protección de las leyes, en violación de la sección 7 de la Constitución del Estado Libre Asociado de Puerto Rico".

Referida la solicitud al Fiscal de este Tribunal, en aquella fecha el Hon. William Fred Santiago, éste se expresó en los siguientes términos: "Que estamos conscientes de que todo litigio tiene que tener un final porque de otra suerte la litigación y los procesos serían intramitables, a la par que se imposibilita el funcionamiento de los tribunales y la administración de la justicia, si a los litigios y a los procesos judiciales no se les pudiese delimitar el tiempo para los mismos . . . . Que también nos hacemos cuestión del hecho de que la administración de la justicia ha de hacerse en función del hombre y de la sociedad, predicamentos de su razón de ser . . . . Que también nos hacemos cuestión del hecho de que un acusado al apelar por derecho propio, y sin la asistencia y el consejo legal, lo hace a su propio riesgo corriendo

todas las consecuencias que de ello puedan derivarse . . . .
Que no obstante lo anteriormente dicho y en virtud de lo
resuelto por esta Hon. Superioridad en el caso de *Pueblo* v.
*Santos*, 80 D.P.R. 611, 614 (1958) y no empece el hecho de
que en este caso de Santos, por haber habido una concesión
al acusado, dándole el beneficio de litigar como pobre, lo que
no está presente en el caso de autos, situación que los dife-
rencia, podría entenderse que la solicitud que un acusado ejer-
cita por sí mismo para apelar, podría ser suficiente 'para que
se dé por cumplido el requisito de que se solicite y obtenga
una orden para la Transcripción de Evidencia' . . . . [Que]
si se entiende que a esta solicitud debe dársele una interpreta-
ción liberal, cónsona con el contenido doctrinal del caso de
Santos, supra, en el uso del poder discrecional de esta Hon.
Superioridad podría dejar sin efecto su orden de 20 de sep-
tiembre de 1956 y reinstalar el recurso de apelación del aquí
acusado mocionante . . . ."

En efecto, el día 5 de diciembre de 1958, considerada la
solicitud del acusado apelante y el informe del Fiscal de
este Tribunal en aquella fecha, Hon. William Fred Santiago,
dejamos sin efecto nuestra anterior resolución de 20 de
septiembre de 1956 desestimando la apelación, reinstalamos
el recurso de apelación, solicitamos la devolución del mandato
y se le instruyó al Juez sentenciador concederle al apelante
un nuevo término para solicitar la transcripción de evidencia.

De muy poco le sirvió al acusado apelante nuestra ins-
trucción al Juez sentenciador de conceder un nuevo término
para que pudiera solicitarse la transcripción. Con el trans-
curso del tiempo había cambiado el cuadro administrativo del
tribunal, el taquígrafo que tomó las declaraciones no formaba
parte del Tribunal, y aunque al principio estuvo conforme en
aceptar una suma razonable que le ofrecía de su propio
bolsillo, el abogado del acusado para preparar dicha trans-
cripción, después solicitó el doble por el mismo trabajo.
Cuando se le cita por desacato el 13 de abril de 1961, con-

testa el requerido informando su renuncia como taquígrafo de récord, estar trabajando con el Gobierno Federal, en el Departamento de la Guerra, División de la Guardia Nacional y alegando no estar obligado a cumplir con la mostración de causas por no ser empleado de la rama judicial ni de ninguna otra rama del Gobierno de Puerto Rico y porque: "Nada encontramos en la transcripción de la disposición legal ni en las demás leyes que regulan la profesión de taquígrafo-reporter que imponga a éstos la obligación de cumplir una orden sobre transcripción de evidencia una vez ha renunciado su cargo . . . . A nuestro juicio, en caso de renuncia el taquígrafo está en la misma situación que cuando se ausenta o incapacita. En otras palabras, el taquígrafo, como funcionario del Tribunal, está obligado a prestar sus servicios gratuitamente cuando se permite a una parte a litigar *in forma pauperis. Aybar* v. *Vara*, 48 D.P.R. 183 (1935). Esa obligación, sin embargo, cesa, cuando él deja de ser funcionario del Tribunal . . . . Pero hay más. La sección 12 del artículo II de la Constitución del Estado Libre Asociado dispone que no existirá la esclavitud ni forma alguna de servidumbre involuntaria salvo la que pueda imponerse por causa de delito, previa sentencia condenatoria . . . y por la sección 16 del mismo artículo II de la Constitución, se reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella, a recibir igual paga por igual trabajo, a un salario mínimo razonable . . . . Con vista en estos derechos constitucionales básicos tenemos que concluir necesariamente, que no pudo ser la intención de los hombres que aprobaron nuestra ley fundamental que a unos seres humanos por razón de haber ocupado un cargo público, pueda obligárseles a desempeñar ciertas labores después de haber cesado en su empleo, por renuncia debidamente aceptada, y ello sin recibir remuneración, mientras que a otros los cubre el palio protector de esas garantías constitucionales."

El acusado contestó esta moción en los siguientes términos: "Alega el taquígrafo ahora por primera vez, que para la fecha en que el Hon. Juez Padró Parés, dictó la orden disponiendo hiciese la transcripción de la evidencia en este caso de oficio, ya él no era taquígrafo del Tribunal por haber renunciado. Sin embargo, dicho taquígrafo nada alegó en un principio cuando se le ordenó por primera vez hacer la transcripción de oficio, allá para el mes de enero de 1959. Por el contrario, dicho taquígrafo, con conocimiento de la situación se limitó a acatar la orden del Tribunal y a solicitar prórrogas para llevar a efecto dicha transcripción, prórrogas estas que dilataron y demoraron innecesariamente los procedimientos en este caso en perjuicio del acusado. Se alega así mismo, que el referido taquígrafo, por más de dos años se mantuvo en silencio sin negarse u objetar el hacer la transcripción de oficio ordenada por el Hon. Juez Padró Parés allá para enero de 1959, habiendo con su conducta demorado y estorbado la justicia y los procedimientos ante este Honorable Tribunal lo cual constituye un desacato. Se alega así mismo, que el taquígrafo tiene derecho a cobrarle al Pueblo de Puerto Rico en todo caso sus honorarios, pues el Tribunal concedió la insolvencia al acusado y éste no viene obligado a pagar, por lo que siendo dicho taquígrafo el único que puede transcribir dichas notas, él viene obligado a transcribir las mismas, bien sea de oficio por haber acatado la orden del Tribunal sin protesta o bien cobrándole al Pueblo de Puerto Rico. Se alega igualmente que no es posible hacer una relación del caso, pues el acusado es un ignorante jíbaro analfabeto y el abogado que suscribe no tomó parte en la defensa durante el curso del juicio ante el Tribunal Superior de Arecibo, ignorando los hechos y la evidencia ofrecida, siendo el único camino posible para perfeccionar la apelación, la transcripción de las notas taquigráficas. Que la alegación que por primera vez y después de dos años hace el taquígrafo Sr. Berríos para negarse a transcribir las notas taquigráficas

en abierta desobediencia de la orden del Tribunal es tardía, estando en 'Stoppel' por sus actos a estas alturas para hacerla, perjudicando gravemente al acusado con su conducta dilatoria y maliciosa que constituye a todas luces un desacato a la autoridad de este Tribunal."

El taquígrafo Sr. Berríos ganó la contienda. Para ello hubo que trasladar el expediente a San Juan pues la orden de desacato la firmó un juez especial. El día 21 de junio de 1961 el acusado apelante, presionado por las órdenes de este Tribunal en el cual aparecía la apelación en aparente estado de abandono, por medio de su diligente defensor, el Lic. Guillermo S. Pierluisi, solicita del Tribunal resuelva si debe o no debe mantener la orden dada al taquígrafo para hacer la transcripción de oficio. El 9 de mayo de 1962 se resuelve por el Tribunal el incidente en los siguientes términos: "Hemos examinado los autos y de los mismos aparece que la orden para la transcripción de evidencia *en forma pauperis* fue dictada por el Tribunal cuando ya el taquígrafo Sr. Alfredo Berríos Pérez había renunciado su puesto como taquígrafo de esta Sala. En su consecuencia estimamos que debemos dejar como por la presente dejamos sin efecto nuestra orden dictada el 13 de abril de 1961. Se exonera al Señor taquígrafo de cumplir con la orden de transcripción de evidencia y toda vez que este caso está pendiente en apelación ante el Tribunal Supremo, procede que el acusado apelante prepare una relación del caso para sostener su recurso de apelación. Notifíquese con copia de esta resolución a las partes."

La exposición del caso radicada ante este Tribunal está tomada de las declaraciones juradas en poder del Fiscal y dice así:

"El juicio contra Catalino Reyes Morales, G55-192, por Asesinato en Primer Grado comenzó a verse el 15 de febrero de 1956 hasta el 24 de febrero del mismo año, estando el acusado debidamente representado por el Lcdo. Diego E. Ramos, Defensor

Público y el Ministerio Público representado por el Fiscal que suscribe. El Tribunal lo presidió el Hon. Juez Rafael Padró Parés.

CARMEN CANDELARIA MEDINA: En primer término declaró como testigo del Pueblo de Puerto Rico, Carmen Candelaria Medina, concubina del acusado, quien declaró que durante dicho concubinato el acusado se portó muy bien con ella, fue siempre cariñoso hasta algún tiempo con anterioridad a los hechos imputados en que injustificadamente empezó a celarla de un individuo nombrado Gustavo Llanes, quien era dueño de una finca que colindaba con el predio de terreno en que ubicaba la residencia del acusado en el Bo. Viví Abajo de Utuado, Puerto Rico.

Declaró, además, Carmen Candelaria Medina que durante el concubinato con el acusado procrearon tres hijos nombrados Ada Irma Reyes de cuatro años de edad, Aurelio Reyes, de dos años y Hortensia Reyes, de diez meses de edad, quienes vivían en compañía y bajo el mismo techo con sus progenitores. Manifestó Carmen Candelaria Medina que surgieron desavenencias y disgustos, pero que volvían a reconciliarse cuando el acusado la iba a buscar para continuar viviendo juntos; que el acusado trabajaba en las faenas en la agricultura, casi siempre en las cercanías de su residencia y que ella le ayudaba en las faenas agrícolas además de atender los oficios del hogar.

Esta testigo siguió manifestando que para el 4 de septiembre de 1955 durante el atardecer y luego del acusado manifestar sus celos, le manifestó a la testigo que acostara a los niños temprano, ella le obedeció, entonces el acusado cerró las puertas de la casa y le dio cuarenta azotes en su cuerpo con un palo de guayabo del grueso de una peseta. Esa noche durmieron separados bajo el mismo techo, al día siguiente, 5 de septiembre de 1955, al atardecer, el acusado Catalino Reyes Morales volvió a pedirle que acostara los niños temprano, que ella lo vio amolando un machete con una lima que había comprado ese día, que ella le obedeció acostando los niños a la hora que él le indicó antes y temiendo que fuera a repetirse la agresión de la tarde anterior le abandonó en un descuido yéndose a proteger en casa de su compadre Juan Cortés, donde pasó la noche del 5 al 6 de septiembre de 1955. Esta testigo manifestó que a la mañana siguiente, o sea, día 6 de septiembre de 1955, vino a la Corte de Utuado a explicar los motivos que tuvo para abandonar al acusado.

*Fotografías*: Se ofreció y se aceptó por el Tribunal en evidencia dos fotografías que fueron marcadas como Exhibits 1-a y 1-b del Pueblo de Puerto Rico, donde la testigo identificó la marca y huellas de los golpes que alega recibió de manos del acusado en el atardecer del día 4 de septiembre de 1955.

CÁNDIDA MEDINA GONZÁLEZ: En el segundo término y como testigo del Pueblo declaró Cándida Medina González mayor de 21 años de edad quien manifestó que para la mañana del 6 de septiembre de 1955 hacía poco tiempo que el acusado y Carmen Candelaria Medina vivían juntos en una casa muy cerca de la casa donde vivía la testigo con su familia. Que ese día 6 de septiembre de 1955, como a las siete de la mañana el acusado Catalino Reyes Morales fue a suplicarle a la testigo que le cuidara sus tres hijos porque alegaba que su mujer lo había abandonado la noche anterior y que iba al pueblo a buscar a alguien que pudiera atenderle sus hijos.

Esta testigo manifestó que ella se negó, pero que a insistencias del acusado y en vista de que éste se veía nervioso y como llorando, accedió en cuidarle los tres niños. Declaró que el acusado le trajo los tres hijos en dos turnos y que el último que le trajo fue al niñito Aurelio Reyes, de dos años de edad y al mismo tiempo que le entrega leche Denia, azúcar y harina de café, el acusado le dijo que ese niñito lloraba mucho porque extrañaba a la madre. Siguió declarando esta testigo que tan pronto el acusado le entregó a su hijo Aurelio Reyes, apenas habían transcurrido dos o tres minutos, casi enseguida del acusado haber dado la espalda para ir al pueblo el niñito empezó a llorar, se esmongó, inclinó los ojos, se veía intranquilo, empezó a botar baba por la boca, no quería ningún alimento y que la testigo pensó que el niñito estaba grave e inmediatamente, no tardó diez minutos, cuando ya ella estaba de camino hacia el Hospital Municipal de Utuado adonde llevó inmediatamente al niño Aurelio Reyes esa misma mañana del 6 de septiembre de 1955.

Cuando el acusado le entregó el niño le dijo: "ese nene la va a molestar mucho y va a estar llorando hasta que yo llegue porque no se queda con nadie".

DR. ROBERTO VEGA: El tercer testigo del Pueblo de Puerto Rico lo fue el Dr. Roberto Vega. Se aceptó su capacidad para declarar y manifestó que practicó la autopsia en el cadáver del niño de dos años de edad, Aurelio Reyes. Que fue traído al Hos-

pital Municipal de Utuado vivo pero falleció casi inmediatamente; que el niñito Aurelio Reyes mostraba convulsiones y vomitaba un líquido blanco por la boca, que el niñito no respondía estímulos físicos, mostraba dificultad para respirar, tenía un ronquillo, acumulación de secreciones y humedad en los pulmones, tenía ruidos respiratorios anormales. Que le indicó atropina digitales y estimulantes del corazón.

Declaró el Dr. Roberto Vega que al practicar la autopsia notó que múltiples lombrices, habían invadido distintos órganos del cuerpo del interfecto, que esta situación puede ocurrir después de la muerte de un ser humano pues las lombrices que pueden haber en el organismo tienden a salir después de ocurrir la muerte. Que practicó la autopsia por instrucciones del Fiscal Efraín Ruíz y extrajo el jugo gástrico del cuerpo del interfecto y las vísceras para que se hiciera un examen toxicológico. El testigo manifestó que el interfecto fue debidamente identificado.

Manifestó el testigo Dr. Roberto Vega, que no le fue posible determinar la causa de la muerte para no arriesgarse sin tener el resultado del examen toxicológico de las vísceras del interfecto. Que los síntomas que observó en el niño Aurelio Reyes eran los que podían observarse en un caso de envenenamiento, tales como el ronquillo que mostraba, la dificultad al respirar, no responder al estímulo físico, esmongamiento, sistema nervioso debilitado, acumulación de secreciones y humedad en los pulmones y aumento en el latido del corazón.

Declaró además que el interfecto era regularmente saludable no tenía el vientre rígido, ni bollos en el vientre como ocurre cuando lombrices en el ser humano tienden a emigrar. Que el niño no tosía. Que cuando hay obstrucción en los pulmones el aire no entra a éstos y en este caso notó que había aire en los pulmones.

*Estipulación*: Posteriormente y por vía de estipulación entre el abogado defensor y el Fiscal Efraín Ruíz, se sometió una estipulación por escrito fechada 21 de febrero de 1955 que fue aprobada por el Tribunal y que consta en los autos de este caso en Secretaría. En dicha estipulación se dispuso que la evidencia a que se refirió el perito Santiago Carmona en su testimonio llegó a sus manos en la forma siguiente:

El Dr. Roberto Vega extrajo el jugo gástrico, lo entregó al Policía Francisco Román Feliciano, Placa 1471, de Utuado, en un envase que identificó el perito Santiago Carmona y entregó

al Juez Marín Báez, quien a su vez se lo entregó al Detective Francisco López conjuntamente con la evidencia examinada por el perito Santiago Carmona en la botella color ámbar y en la botella de un cuartillo, así como evidencia de azúcar, café molido y media lata de leche Denia en polvo y una bolsita conteniendo polvo Vapofos, entregando López toda esta evidencia al Asistente Químico Ángel Cordero quien a su vez la entregó al perito Santiago Carmona.

Se estipuló además que las uñas del acusado las obtuvo el Policía Francisco Román del propio acusado las entregó al Fiscal Efraín Ruíz y éste las entregó al Policía Ángel Rivera en dos sobrecitos apartes y pasaron directamente al Asistente Químico Ángel Cordero de manos de Ángel Rivera y de Ángel Cordero al perito Santiago Carmona en las mismas condiciones en que fue obtenida sin alteración de clase alguna.

El Lcdo. Diego E. Ramos solicitó del Tribunal se le designara un médico para asesorarlo y se le designó al Dr. J. Rodríguez Quiñones de Arecibo, Puerto Rico.

SANTIAGO CARMONA RAFAEL: En cuarto término prestó testimonio el perito químico Rafael Santiago Carmona. Se refirió en su testimonio a cuatro potes de metal conteniendo ampolletas y se marcaron como Identificación 4 del Pueblo. Dos de las ampolletas mencionadas contenían residuos de Vapofos. Identificó dos sobres conteniendo uñas de ambas manos del acusado Catalino Reyes Morales y una bolsa de papel conteniendo determinados polvos. Todo se marcó como Exhibit 4 del Pueblo con letras A B C y D.

Manifestó el perito Santiago Carmona luego de identificar una lata sin tapa de las que se usan para envasar leche Denia conteniendo en el fondo un residuo color arena, que el resultado del análisis de dicha evidencia fue de que la misma contenía paration, que es un veneno tóxico y peligroso. Identificó además y se refirió en su testimonio a una botella de leche que analizada resultó que contenía residuos de Vapofos. Que el residuo pesó 3.4 gramos (1.4% de Vapofos) acompañando e identificando una ampolleta del residuo aislado. Esta parte del testimonio la relacionó con una botella de color ámbar de las que se usan para envasar Malta Corona que contenía según dijo, aproximadamente 250 cc. de un líquido parecido a la leche con un ligero color amarillo.

Refiriéndose el perito Santiago Carmona a la botella de cristal transparente de cuartillo, con tapón de corcho, que contenía 255 cc. de un líquido parecido a la leche con un ligero color amarillo, a cuya evidencia se hizo relación en la estipulación del 21 de febrero de 1956, sometida en evidencia, dijo el perito Santiago Carmona que el resultado del análisis fue de paration en el residuo. Que dicho residuo fue aislado por extracciones y contrifugación (centrifugación), pesando 13.8 gramos aproximadamente (6.19% de vapofos), acompañando e identificando este testimonio con la botella del residuo aislado relacionando este testimonio con la botella de un cuartillo que llegó a sus manos según la estipulación escrita y sometida en evidencia y a la que se ha hecho referencia.

Continuó declarando el perito Santiago Carmona en relación a la evidencia sometida por vía de estipulación respecto a las uñas del acusado que en dos sobres apartes recibió para examen, que las uñas de Catalino Reyes Morales en su mano derecha resultaron positivo de paration y que las uñas de Catalino Reyes Morales en su mano izquierda resultaron positivo leve de paration. Manifestó dicho perito que el Vapofos es un producto comercial que contiene 15% de paration, compuesto orgánico sintetizado por el Dr. Schraeder y de aplicación exclusiva como insecticida y fungicida. Que la muerte puede ocurrir dentro del término de media a cuatro horas y a veces ocurre dentro de diez minutos después de haberse ingerido el mismo. Que la dosis tóxica es 15 mgm. Que biológicamente produce los siguientes síntomas: pupilas en forma de cabeza de alfiler, pérdida de percepción de profundidad, dolor de cabeza, diarrea, dolor en el pecho, espasmo bronquial, vómitos, salivación, convulsiones, pérdida de reflejos, pérdida respiratoria y muerte.

Dr. Benito Irizarry: Siguió el testimonio del Dr. Irizarry, quien manifestó sobre los síntomas biológicos que produce en el ser humano el Vapofos y a preguntas hipotéticas en relación al testimonio del Dr. Roberto Vega y al testimonio del perito Santiago Carmona declaró que en el caso de Aurelio Reyes interfecto en este caso, debió haberse producido un edema pulmonar y la muerte de dicho ser humano. Que su muerte no pudo haber sido producida por ninguna otra causa y sí por envenenamiento con Vapofos.

Declaró el referido Dr. Irizarry que ha tenido experiencia de casos por obstrucción respiratoria por lombrices en donde el paciente muere en un par de horas. Que no se produce el edema pulmonar y que el pulmón en ese caso no recibe aire, no se infla.

JUAN COLLAZO NEGRÓN: Declaró Juan Cortés Negrón que el lunes 5 de septiembre de 1955, después de la 1:00 de la tarde, el acusado Catalino Reyes Morales le compró una lima sin cabo por la que le pagó quince centavos. Que la distancia que había entre su tienda y la casa de Catalino Reyes Morales no era menos de un cuarto de Kilómetro. El nombre de este testigo es Juan Collazo Negrón y no Juan Cortés Negrón.

POLICÍA FRANCISCO ROMÁN FELICIANO: Prestó testimonio el señor Francisco Román Feliciano, Policía Estatal. Indicó que estuvo a cargo de la investigación de estos hechos y que en la mañana del 6 de septiembre de 1955, el acusado Catalino Reyes Morales se personó al Cuartel Estatal de Utuado informando que su mujer Carmen Candelaria Medina, le había envenenado los nenes con una leche que tenía preparada con veneno de tabaco. Que la había sorprendido con la leche preparada con veneno y se la había botado. Que lo había hecho en dos ocasiones. Que siguiendo instrucciones del Juez Jorge Marín Báez, fue con Catalino a buscar a Carmen.

Manifestó este testigo que Catalino decía que Carmen le había dado el veneno en la leche a los nenes y que el domingo anterior 4 de septiembre de 1955, había sorprendido a Carmen con un veneno preparado en una lata de las usadas para envasar leche Denia, donde le iba a dar el veneno a los nenes y que con motivo de todo esto Catalino manifestó que le había dado una pela a Carmen diciendo Catalino que le había dicho a Carmen que no la iba a denunciar porque creía que con la pela que le había dado era suficiente. Relató el testigo que las manifestaciones de Catalino se referían a hechos ocurridos el domingo 4 de septiembre de 1955. Que esa noche se habían quedado tranquilos y habían almorzado y desayunado al día siguiente como de costumbre. Que al día siguiente lunes, Catalino había ido a trabajar.

Manifestó dicho testigo que Carmen le informó que Catalino la celaba de Gustavo Llanez y que por eso le pegaba. Que el lunes 5 de septiembre de 1955 el acusado tuvo unas palabras con Gustavo Llanez por celos. Que Catalino dijo que iba a comprar una lima para amolar el machete porque lo de ella iba a ser más

grande que la noche anterior y que con motivo del temor que la fuera a cortar se había ido de la casa el lunes poco después de las 6:00 de la tarde. Dijo este testigo que Catalino Reyes, el acusado, le manifestó que su concubina Carmen Candelaria Medina, lo había abandonado en la tarde del lunes 5 de septiembre de 1955 y que lo había dejado solo con los nenes, o sea, con sus hijos. Que el martes por la mañana él había dejado los nenes con una vecina para que le cuidara los nenes en lo que iba al pueblo.

JUAN CORTÉS: El último testigo en declarar lo fue el señor Juan Cortés, quien manifestó que el lunes 5 de septiembre de 1955 al atardecer llegó a su casa su ahijada Carmen Candelaria Medina y que pasó la noche del 5 al 6 de septiembre de 1955 en su casa muy distante, a más de un kilómetro o dos de la casa en donde residía Carmen Candelaria Medina y Catalino Reyes Morales.

*Declaraciones Juradas del Acusado*: Por último, se presentaron y se aceptaron en evidencia por el Tribunal, dos declaraciones juradas y suscritas por el acusado Catalino Reyes Morales, una fechada 8 de septiembre de 1955 que consta de dos páginas por ambos lados, y la otra declaración de fecha 21 de septiembre de 1955 que consta de una página por ambos lados. Dichas declaraciones aparecen en los autos de este caso como Exhibit 5A del Pueblo y como Exhibit 5B del Pueblo.

*Primera Declaración*: En la primera declaración del acusado Catalino Reyes Morales, de fecha 8 de septiembre de 1955, sustancialmente éste manifestó que hacía siete meses vivía con Carmen Candelaria Medina y sus tres hijos entre los que mencionó al interfecto Aurelio Reyes, quien iba a cumplir dos años de edad. Manifestó que tuvo desavenencias con su concubina, pero que mientras vivieron en la finca de Julio Villafaño no hubo discusiones entre ambos. Que nunca tuvo celos de su mujer, que ella era amable y cariñosa.

Que para el domingo 4 de septiembre de 1955 ambos estaban contentos y alegres y ella le ayudó a trabajar en un semillero. Que al día siguiente se desayunó y almorzó como de costumbre. Aceptó haber amolado un machete el lunes por la tarde. Que el domingo 4 de septiembre de 1955 entre 6:00 y 7:00 de la noche su mujer y él tuvieron un trastorno. Que le había dado una pela a la mujer con un palo de guayabo. Que ella no se defendió de los golpes. Que esa pela se la dio a su mujer porque había sentido

un fuerte olor a veneno y que vio leche preparada con veneno, manifestando que no vio que ella tratara de envenenar a sus hijos o que fuera a darle de esa leche a los nenes. Que al día siguiente, lunes 5, tanto él como los nenes almorzaron y comieron tranquilos. Que no sintió temor de que ella lo envenenara a él o a los nenes al día siguiente.

Manifestó el acusado que el lunes 5 de septiembre de 1955 su concubina, Carmen Candelaria Medina, lo abandonó como a las 7:00 de la noche. Que había ido al amanecer luego de su concubina haberlo abandonado a casa de una vecina para que le cuidara sus hijos en lo que él iba al pueblo. Que su niño, refiriéndose a Aurelio Reyes, estaba bien de salud, no se quejaba de nada, estaba contento y alegre. Que durante la noche del 5 al 6 de septiembre de 1955 había dejado una latita con leche Denia envenenada en el piso, pero que al día siguiente cuando se dispuso a llevarla al cuartel, la misma estaba en el mismo sitio y contenía la misma cantidad que al momento de dejarla en el piso de su casa.

*Segunda Declaración*: Refiriéndonos a la declaración jurada del acusado Catalino Reyes Morales de fecha 21 de septiembre de 1955 manifestó el acusado libre y voluntariamente que había salido el martes 6 de septiembre de 1955 por la mañana hacia el Cuartel de la Policía con la leche en la botella y una latita de leche Denia. Que su hijo Aurelio Reyes había dejado de tomar en botella y tomaba en tazas. Que el domingo anterior le había dado cuarenta palos a su concubina. Que en una tablilla había una bolsa con veneno el domingo anterior a la fecha de los hechos. Que no botó la bolsita de veneno el domingo en la letrina por falta de precaución.

Que cuando tomó la bolsita en sus manos la cogió con bastante precaución con dos dedos por una esquinita de la bolsa con los dedos índice y pulgar de la mano derecha. Que nunca metió las manos dentro del saco. Que volvió a ver la bolsa con el veneno el lunes siguiente a las 6:30 de la tarde sobre el fogón. Que la botella y la lata de leche que alega había visto el lunes por la tarde la dejó en el piso en una esquina de la casa.

Manifestó el acusado en su declaración jurada que conocía que el veneno a que se refirió en su testimonio era peligroso. Declaró además el acusado que en los últimos meses hasta la fecha en que ocurrieron los hechos no bregaba con esa clase de veneno. Aceptó además que había consentido libremente en que

le extrajeran las uñas de la mano derecha; y mano izquierda para examinarlas en el laboratorio, consintiendo en que las mismas se examinaran para ver si había alguna sustancia venenosa."

Como se ve, la exposición del caso radicada en este Tribunal, por consistir de las declaraciones que constan en el expediente del Sr. Fiscal de la Sala de Arecibo, Hon. Efraín Ruíz Laabes, no contiene las objeciones de la defensa a la prueba documental u objetiva o al interrogatorio oral de los testigos de cargo, ni el contrainterrogatorio de la defensa a dichos testigos, ni las instrucciones al Jurado del Juez que presidió el proceso, Hon. Rafael Padró Parés.

En su alegato, la digna representación del acusado apelante, señala los siguientes errores: (1) Dadas las circunstancias que rodean la exposición del caso, se priva al acusado del debido proceso de ley al no poder, en el ejercicio de su derecho de apelación, tener el beneficio de que este Honorable Tribunal revise las instrucciones dadas al Jurado por el Juez Sentenciador. (2) Se cometió el error de derecho al admitir fotografías de golpes alegadamente causados por el acusado a su concubina Carmen Candelaria Medina, golpes éstos que nada tenían que ver en relación directa con el caso en sí y que más bien sirvieron para impresionar al Jurado desfavorablemente en contra del acusado. (3) Porque la prueba en este caso es estrictamente circunstancial, confusa, que no excluye la posibilidad de haber muerto el menor Aurelio Reyes como resultado de las lombrices halladas en su cuerpo o como resultado de haber sido envenenado por su propia madre, Carmen Candelaria Medina.

1. Cuando el 10 de febrero de 1964, y en virtud de una estipulación firmada por el Fiscal de la Sala de Arecibo del Tribunal Superior de Puerto Rico, Lic. Efraín Ruíz Laabes y por el abogado del acusado apelante Lic. Guillermo S. Pierluisi, se radica en este Tribunal la exposición del caso, está en vigor en Puerto Rico la Regla 208 de las Reglas de Procedi-

miento Criminal de 1963, que dispone: "En caso que no se hubieren tomado notas taquigráficas de la prueba o de los procedimientos durante una vista o juicio, o que por cualquier razón dichas notas no pudieren transcribirse, el apelante podrá preparar una exposición de la prueba o una relación de los procedimientos, usando para ello los mejores medios disponibles, incluyendo su recuerdo, para ser usada en lugar de una transcripción taquigráfica. Esta exposición o relación se notificará al fiscal, quien deberá presentar sus objeciones o proponer enmiendas, dentro de los diez días después de notificado. Inmediatamente después, dicha exposición o relación con las objeciones o enmiendas propuestas, se someterá al Tribunal Superior para su resolución y aprobación, y el Secretario de dicho Tribunal las incluirá, así resueltas y aprobadas, en el expediente de apelación."

Es indudable que un simple traslado de la investigación del Fiscal, en forma narrativa, a la exposición del caso, no es lo que propone la Regla 208, antes acotada. La exposición, en cuanto a su contenido, tiene que ser algo parecido a la transcripción de la vista, con la insaculación del Jurado, su calificación y aprobación final, con sus ofrecimientos de prueba, las objecciones a la admisión de la misma, las resoluciones del Juez que preside el proceso admitiendo o denegando la prueba ofrecida, las instrucciones al jurado. En este caso, la exposición contiene todo lo que puede ser perjudicial al acusado y nada de lo que pueda serle beneficioso. Es lo mismo que condenar a un hombre únicamente por la prueba que haya podido acumularse en contra suya. La digna representación del acusado apelante hace énfasis en la ausencia de las instrucciones al Jurado en su totalidad. por su parte, la digna representación del Estado parece inclinado a afirmar que las instrucciones no son parte intrínseca del legajo de la apelación. Lo más que hemos dicho hasta ahora es que: "La alegación al efecto de que le fue perjudicial el que el Juez que presidió la vista no hiciera un resumen

de la prueba se contesta con la afirmación que aparece en el récord, por parte de la defensa, de que está conforme con que no se haga tal resumen:" *Pueblo* v. *Rivera Romero,* 83 D.P.R. 471 (Dávila) (1961), cita precisa a las págs. 484 *in fine* y 485. En ese mismo caso a renglón seguido se llama la atención a lo resuelto en un caso anterior nuestro: *Pueblo* v. *Millán,* 71 D.P.R. 440 (Negrón Fernández) (1950), cita precisa a las págs. 443–445:

"Según aparece de los autos ante nos, el juez de la corte inferior, al comenzar sus instrucciones al jurado, manifestó: 'Las partes estipularon que no se hiciese un análisis de la prueba.' Si bien en el récord no aparece una estipulación en ese sentido, no estamos en condiciones de resolver que en efecto así no se acordara por las partes, sobre todo cuando nada hay en autos que indique que el acusado por conducto de su abogado hiciera objeción a las manifestaciones del tribunal o tomara excepción de las instrucciones al jurado. Es ahora en apelación, por primera vez, que sostiene que no hubo tal estipulación. En *Pueblo* v. *Valentín,* 63 D.P.R. 787, 794 (1944), dijimos:

'Es cierto que la corte está obligada a hacer un resumen de la evidencia, según se ha resuelto en los casos de *Pueblo* v. *Cartagena,* 54 D.P.R. 870 y *Pueblo* v. *Lebrón,* 61 D.P.R. 657; pero cuando la corte, por inadvertencia o por alguna otra razón deja de hacerlo, es al acusado a quien corresponde solicitar de la corte que así lo haga. Si el acusado, como ocurrió en el presente caso, renuncia ese derecho al hacer constar expresamente que no tiene objeción alguna a las instrucciones, no tiene motivo alguno para quejarse. Además, no estamos convencidos de que el acusado haya sufrido perjuicio alguno.'

Estamos satisfechos, bajo las circunstancias de este caso, de que, según lo indicó el juez inferior, el acusado renunció al resumen de la prueba, y de que por lo tanto no tiene motivo alguno para quejarse. No obstante, precisa repetir aquí una vez más lo dicho en *Pueblo* v. *Lebrón,* 61 D.P.R. 657, 670, y reiterado en *Pueblo* v. *Rodríguez,* 69 D.P.R. 980, 987, que es expresión cabal de la norma que los jueces de distrito deben invariablemente seguir, en juicios por jurado, conforme al inciso 8 del artículo 233 del *Código de Enjuiciamiento Criminal:*

'La práctica de omitir el juez hacer el resumen de la prueba, no sólo es contraria al precepto expreso de la ley, si que perjudicial a los fines de la justicia. La razón por la cual debe hacerse un resumen de la prueba es, como dice el precepto transcrito, traer a la atención del jurado los hechos esenciales presentados por una y otra parte. En otras palabras, separar la paja del grano, evitando así que el jurado pueda ser inducido a error o confusión al tomar en cuenta hechos que son inmateriales para la resolución del caso. Es más, el juez en sus instrucciones no debe transmitir la ley en abstracto. El jurado se compone de personas legas en materia de Derecho y transmitirles la ley en esa forma, equivale a poner en sus manos los estatutos para que ellos resuelvan el caso de acuerdo con la interpretación que crean más correcta. Por eso la mejor práctica es, después de hacer el resumen, exponer al jurado las distintas conclusiones a que pueden llegar en la apreciación de la prueba e indicarles entonces el veredicto que proceda de acuerdo con cada una de dichas conclusiones. De esa forma la misión del jurado queda circunscrita a sus verdaderos límites, es decir a determinar las cuestiones de hecho, y se evita que a pesar de estar todos de acuerdo en cuanto a los hechos, incurran en error en la aplicación de la ley.' "

Un asesinato en primer grado, como consecuencia de los distintos elementos mentales y reglas de la intencionalidad que intervienen en la reducción del grado, exige siempre cierto refinamiento judicial, para cumplir con el deber de darle al jurado las instrucciones más cabales. Al momento de resumir la prueba, hay ciertos hechos, algunos estados de pasión, atisbos de violencia que deben destacarse por el perito de la ley para que el jurado entienda mejor la modalidad del delito a que corresponde cada situación de hecho. Hubiera sido imposible la reconstrucción de dichas instrucciones por el ilustrado Juez que presidió el proceso porque cuando se firma la estipulación por las partes, el ilustrado Juez no formaba parte del Tribunal Superior de Puerto Rico y cualquiera reconstrucción suya hubiera sido objetable.

■ 2–3. Si bien puede admitirse que hay prueba en cuanto a la muerte de un niño, presuntivamente por en-

venenamiento, el motivo, el designio de la voluntad, la intención hay que establecerlo en virtud de una simple deducción de los hechos. En este caso, igual peso tendría la posibilidad del descuido que del hecho intencional. Siendo esto así, cumple mejor con los fines de la justicia un nuevo juicio, en el cual además del esclarecimiento de los hechos, tengamos un cuadro más claro del peritaje sobre la causa de la muerte.

*Debe revocarse la sentencia dictada por la Sala de Arecibo del Tribunal Superior de Puerto Rico de fecha 29 de febrero de 1956.*

El Juez Asociado Señor Pérez Pimentel concurre con el resultado en voto separado al cual se une el Juez Asociado Señor Dávila. El Juez Asociado Señor Blanco Lugo concurre con el resultado en voto separado con el cual está conforme el Juez Asociado Señor Ramírez Bages. El Juez Asociado Señor Santana Becerra no intervino.

—O—

Voto separado del Juez Asociado Señor Pérez Pimentel, con el cual concurre el Juez Asociado Señor Dávila.

Un estudio del expediente revela que las incidencias habidas en los trámites posteriores a la interposición del presente recurso de apelación, entre ellas, la forma de preparar la exposición del caso utilizando como fuente única para ello la información del Fiscal, la imposibilidad de transcribir las instrucciones trasmitidas por el Juez al Jurado, así como la evidencia sometida a la consideración de éste y los demás procedimientos del juicio, han privado al apelante de ejercer plenamente su derecho de apelación, por lo que procede en bien de la justicia, revocar la sentencia apelada y ordenar la celebración de un nuevo juicio.

—O—

Voto concurrente del Juez Asociado Señor Blanco Lugo, con el cual concurre el Juez Asociado Señor Ramírez Bages.

Un examen de los autos revela que, en sus gestiones para perfeccionar la apelación y ante la imposibilidad de preparar una transcripción de las notas taquigráficas debido a la renuncia del taquígrafo que intervino en el proceso, el propio apelante optó por una exposición del caso.(¹) Al efecto el Lic. Guillermo Pierluisi se comunicó con el Lic. Diego Ramos, quien había actuado como defensor en el tribunal de instancia, pero éste no pudo ayudarle pues no recordaba nada de los incidentes ni de la prueba que desfiló en la vista del caso. Frente a ese nuevo escollo, le propuso al fiscal que preparara la exposición del caso con lo que él recordaba de la prueba y las declaraciones del expediente de su investigación, a fin de solicitar *por estipulación* que el tribunal le impartiera su aprobación a los fines de la tramitación del recurso.(²) Así se hizo. Efectivamente, en 3 de diciembre de 1963, *sin oponer reparo alguno*, se sometió la exposición del caso que fue aprobada por resolución de este Tribunal de fecha 20 de mayo de 1964.

---

(¹) Véanse, la Regla 208 de las de Procedimiento Criminal de 1963, y sus antecedentes el Art. 356 del Código de Enjuiciamiento Criminal, ed. 1935, 34 L.P.R.A. sec. 1081, y el Art. 356 del Código de Enjuiciamiento Criminal de 1902, E.R. (1902), pág. 761, en relación con los Arts. 294 a 300 de este último cuerpo legal, E.R. (1902), págs. 745–748.

(²) De la carta dirigida por el Lic. Pierluisi al Fiscal Efraín Ruíz copiamos:

"En relación a nuestra entrevista en cuanto al caso de referencia pendiente ante el Hon. Tribunal Supremo de Puerto Rico, te ruego me indiques si preparaste la exposición del caso que me prometieras, habida cuenta de que eres la única persona que puede hacerlo por el récord de lo declarado por los testigos en el Tribunal.

"Como te informara, el compañero Diego Ramos, quien defendiera al acusado ante ese Hon. Tribunal, no recuerda nada en relación con los hechos; difícilmente podría perfeccionar la apelación sin tu ayuda. Como te indicara, estoy dispuesto a aceptar la exposición que tú hagas, pues tengo la más absoluta confianza en tu integridad y honradez profesional. Te ruego pues, si no has hecho dicha exposición, la prepares y la sometas al Tribunal por estipulación tuya y mía a fin de que se apruebe y se eleve. Si lo deseas, me la puedes remitir y yo preparar la estipulación y te la envío para tu firma. El Hon. Tribunal Supremo me concedió un término de 60 días para prepararla, el cual expira el 13 de noviembre del año en curso."

Siendo esa la situación no vemos cómo ahora pueda apuntarse que la omisión de exponer o resumir las instrucciones trasmitidas al jurado dé lugar a la revocación. Era la obligación del apelante, si le interesaba, hacer las gestiones para que se incorporara en la exposición lo relacionado con las instrucciones, véase, *Pueblo* v. *Lafont,* 54 D.P.R. 368 (1939) pero no lo hizo, tal vez advertido de lo dispuesto en la Regla 10(g) de nuestro Reglamento.(³) Prefirió permanecer callado. Si en algún caso debe aplicarse la presunción de la regularidad de los procedimientos es en éste. Cf. *Pueblo* v. *Díaz* 5 D.P.R. 202 (1904); *Pueblo* v. *Lugo,* 16 D.P.R. 249 (1910). Además, realmente esto no tiene la importancia que pretende atribuírsele. No entra en juego la reducción del grado del delito. Tratándose de una muerte alegadamente causada por envenenamiento, sólo había dos posibles veredictos, asesinato en primer grado o absolución. Es significativo además que no se presentó prueba alguna de defensa y que "la posibilidad del descuido" que se insinúa tenía que encontrar fundamento en la única prueba que se produjo, la de cargo, que incluyó dos declaraciones prestadas por el apelante.

Para resumir, los supuestos perjuicios que se adelantan son más aparentes que reales. Afortunadamente la Regla 12.2 de las de Administración del Tribunal de Primera Instancia, adoptada en 3 de mayo pasado, evitará en gran medida la repetición de una situación de hechos como la que aquí se presenta.

Ahora bien, como hemos dicho, entre la prueba admitida que consideró el jurado se encuentran dos declaraciones

---

(³) "Cuando en una causa criminal se presente a este Tribunal una solicitud pidiendo que se agreguen a los autos las instrucciones dadas al jurado en el tribunal de instancia, se denegará dicha solicitud, a menos que se demuestre que la omisión de incluir dichas instrucciones en los autos ha ocurrido por culpa o negligencia del secretario del Tribunal Superior; o que el apelante pueda probar que antes de la remisión de los autos a este Tribunal, ha tratado de conseguir que las instrucciones fuesen puestas por escrito, y firmadas por el juez, y que su petición en tal sentido ha sido denegada por razones improcedentes."

prestadas por Catalino Reyes durante la investigación, cuando ya se le señalaba como posible acusado. Aunque en dichas declaraciones no se admite expresamente la comisión del delito, las mismas contienen suficientes elementos incriminatorios que conjuntamente con el resto de la prueba testifical completan la cadena de los hechos que señalaban su culpabilidad fuera de duda razonable. Tratándose de un caso que dependió exclusivamente de prueba circunstancial, requeriríase su exclusión bajo la norma de *Rivera Escuté* v. *Jefe Penitenciaría*, 92 D.P.R. 765 (1965), ya que fueron obtenidas sin que se le hiciera la advertencia de su derecho a estar asistido por abogado. Por ese único fundamento revocaría la sentencia y ordenaría la celebración de un nuevo juicio.

Estoy autorizado para señalar que el Juez Asociado Señor Ramírez Bages concurre con el presente voto.